# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| GULF COAST ASPHALT COMPANY, L.L.C., | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) CIVIL ACTION NO. 09-187-CG-M ) |
| CHEVRON U.S.A., INC., | ) ) |
| Defendant, and Third-Party Plaintiff, | ) ) ) |
| vs. | ) ) |
| TRIFINERY, INC., | ) ) |
| Third-Party Defendant. | ) |

## ORDER

On April 6, 2009, Gulf Coast Asphalt Company, L.L.C. ("GCAC") brought a lawsuit against Chevron U.S.A., Inc. ("Chevron") under the "citizen suit" provisions of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972, seeking "injunctive and other relief ordering Chevron … to clean up thousands of gallons of crude oil it illegally buried at its former refinery and storage facility on Blakely Island in Mobile, Alabama." (Doc. 1, p. 1). Specifically, GCAC brought suit under 42 U.S.C. § 6972(a)(1)(B) alleging Chevron was a "past owner" of a "treatment, storage, or disposal facility" who "contributed to the past or present… disposal of solid waste… which may present an imminent and substantial endangerment to health or environment" ("RCRA Count I"); and under 42 U.S.C. § 6972(a)(1)(B) alleging Chevron "violated RCRA's prohibition against open dumping and improper land disposal" and

1

failed "to perform closure of the contaminated Parcel B area." ("RCRA Count II"). (Id., ¶¶ 25 & 26). On August 17, 2009, this court adopted a report and recommendation dismissing RCRA Count II with prejudice. (Docs. 46 & 47). On October 14, 2009, Chevron filed a third-party complaint against Trifinery, Inc. ("Trifinery") seeking contractual indemnification from and against the claims made by Gulf Coast. (Doc. 53, p. 1). On November 16, 2009, Trifinery filed its answer and also asserted several counterclaims against Chevron for fraud and misrepresentation, promissory fraud, and breach of contract. (Doc. 15, pp. 11-15). On April 6, 2010, this court adopted a report and recommendation dismissing all of Trifinery's counterclaims against Chevron. (Docs. 65 & 68). This matter is now before the court on Chevron's motion for summary judgment (Doc. 61), GCAC's and Trifinery's response (Doc. 69), and Chevron's reply. (Doc. 76). For the reasons stated below, Chevron's motion for summary judgment is due to be **GRANTED.**

## FACTS

Prior to December 30, 1993, Chevron owned property in Mobile, Alabama, located at or near 835 Cochrane Causeway, Highway 90/98 which was divided into three parcels known respectively as Parcels A, B, and C and which included an asphalt refinery and related substructures and tanks (hereinafter referred to collectively as the "Facility" or "Property"). (Docs. 61-10 & 61-2 and Doc. 1, ¶ 11). Parcel B is the only portion of the Facility that is at issue in this case. (Doc. 1, ¶ 25). Prior to September 30, 1993, there were negotiations between Chevron and Trifinery concerning the purchase of the Facility. (Doc. 1, ¶ 12; Doc. 23, ¶ 12). At some point in time, Chevron gave Trifinery a "Phase I and Limited Phase II Environmental Site History Assessment Report." (Id.). The plaintiff alleges that "[i]n that report, Chevron represented that there had been a spill of approximately 1,000,000 gallons of asphalt residuum on

2

Parcel B in October 1976 but that the spilled material had been removed and disposed of in accordance with regulations of the Alabama Department of Environmental Management ["ADEM"]." (Doc. 1, ¶ 12).

On September 30, 1993, Trifinery, which is owned and operated by Sanford Brass, entered into a Purchase and Sale Agreement ("PSA") with Chevron to purchase the Facility. (Doc. 61-2). The PSA provides that

> "[e]xcept as expressly set forth in this Section 5, Buyer accepts the Land "AS IS" and "WITH ALL FAULTS" AND, EXCEPT AS OTHERWISE HEREIN PROVIDED, WITHOUT ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED ON THE PART OF SELLER, OR ARISING BY OPERATION OF LAW INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE LAND.

> (Doc. 61-2, p. 7, ¶ 5.e).

Furthermore, the PSA states that Trifinery "shall release, indemnify and hold [Chevron] harmless from and against all claims, expenses (including reasonable attorneys' fees), loss and liability arising from any environmental contamination on or under" the Facility. (Id.). However, this release and indemnification provision has an exception as stated in subsection 5.d which provides that

> [Chevron] shall indemnify, and hold [Trifinery] harmless from and against all claims, expenses (including reasonable attorneys' fees), loss or liability arising from (i) any claims by third parties to the extent based on Covered Contamination or (ii) any cleanup costs and related expenses incurred as a result of any cleanup of Covered Contamination which may be ordered or effectuated subsequent to the date of the Closing by federal, state or local governmental authorities.

> (Id., ¶ 5.d).

"Covered Contamination" is defined as "environmental contamination which [1] violates applicable federal or local laws and regulations as in effect and as enforced on the date of the Closing and which [2] either (i) is located on or under the Property on the date of the Closing or

3

(ii) is now and hereafter located off the Property but which originated from operations on the Property prior to the date of the Closing." (Id., ¶ 5.a).

The PSA also provided a two-month pre-closing "Review Period" in which Trifinery had the right "to terminate [the PSA] by giving written termination notice to [Chevron] if [Trifinery] in its sole discretion determines that the Property is not satisfactory for Buyer's intended use of it or for any other reason in [Trifinery's] sole and absolute discretion." (Id., p. 9, ¶ 6.b). Pursuant to the PSA, Chevron was "currently undertaking… an environmental review of the Property to determine the presence of Covered Contamination" but that Trifinery "may, at [its own] expense, make its own environmental review of the Property, and [Chevron] shall grant [Trifinery] reasonable access to the Property for such purpose prior to the closing date." (Id., p. 6, ¶ 5.b).

At this time, Antonio Martinez was Trifinery's "environmental manager" who served as "environmental liaison with Chevron for Trifinery". (Doc. 61-3, Brass Dep., pp. 4-5). McGlinchey, Stafford & Lang ("McGlinchey") were the legal counsel who represented Trifinery during the purchase of the Facility (Id., pp. 2-3), and Tom Joiner & Associates ("TJ&A") were hired as a consultant to help with environmental due diligence. (Doc. 61-4, Martinez Dep., p. 2).

On November 2, 1993, Raymond C. Kimbrough, a registered environmental property assessor and certified environmental auditor who works for TJ&A, sent a letter to Peggy Felder of McGlinchey stating that

> With the limited amount of information that we have, it appears that Phase II Assessment may have been focused too narrowly. Based on the indemnifications in the sales agreement between Trifinery and Chevron, it appears that Chevron may only be financially responsible for contamination which is "located" or "identified" by the closing date. Therefore, if the Phase II Assessment for the site does not detect contamination which may be present, then Chevron may not be liable for that contamination.
>
> Also, please be aware that if future enforcement actions are carried out by the EPA or ADEM at this site, they will be directed toward the owner (Trifinery) whether the enforcement actions are issued for contamination which occurred

before or after the sale. So, Trifinery really needs to have a clear picture of what they are getting into. That is why we have proposed the sampling of the wells that you discussed earlier with Bob Wood.

(Doc. 61-5, pp. 1-2).

On November 3, 1993, TJ&A and Martinez reviewed the ADEM records and interviewed ADEM personnel regarding the Facility. (See Doc. 61-6, Wood Dep., pp. 5-6; Doc. 61-7; Doc. 61-4, Martinez Dep., pp. 2-3). The results of that review was summarized on November 5, 1993, in a memorandum written by Minda T. Paxton of TJ&A and sent to Bob Wood, who is president of TJ&A ("T&J Memorandum"). (Doc. 61-8). That memorandum explains, in part, that:

> The Land Division files contained details of at least two spills previously mentioned in the Phase I and II Assessments provided by Chevron. There was a detailed file of the 1976 spill of one million gallons of asphalt. ADEM was not in existence in 1976 and the spill was handled by the Mobile County Health Department in cooperation with the Alabama Water Improvement Commission (AWIC). Later the Public Water Supply Department became involved due to the potential for release to a public drinking water supply. The asphalt recovered from the spill was deposited in a surface disposal site operated by Dirt, Inc. Eventually it was mixed with sludge and stabilized. Pictures taken by Dick Schell[, who works at ADEM,] show the area was covered and the berms were intact. Upon questioning Dick Schell, he said he remembered the site and it had been closed… According to Steve Jenkins, neither of these spills was subject to RCRA due to the time frame in which they occurred. In other words, regulations in place in 1976… did not consider these hazardous wastes. However, if contaminants are found in the soil that are hazardous according to today's regulations and that could have resulted from one of these spills, then this site would come under RCRA requirements and clean-up would have to take place. Knowing that the potential exists for contamination to be present at this site due to these spills, it would be to Trifinery's advantage to thoroughly investigate these areas prior to purchase.
>
> … Dale Case and Fred Mason represented the Groundwater Division [of ADEM]. The Groundwater Division file for this facility was minimal. There was some correspondence and a copy of the Phase I and II reports submitted by Chevron. Based on this report, Dale Case said there is contamination present at this site and the Department will be addressing it. The type and extent of Corrective Action required will be dependent on the threat to human health and the environment… Fred Mason did not say when the Department will complete their review of the Phase II Assessment or when their recommendations for Corrective Action at this site will be ready. He did say they tried to turn things around within a 90 day time frame, however, our experience suggests the actual length of time may be

> much longer, possibly as long as six months to a year. Since the Department has yet to fully evaluate this site with regard to soil and groundwater contamination, this poses the greatest threat to Trifinery and their proposed purchase agreement. We strongly suggest that Trifinery do additional sampling at the site independent of Chevron's sampling and/or include language in the sales contract to protect themselves from inheriting a potentially expensive environmental liability.
>
> (Doc. 61-8, pp. 2-3).

Martinez acknowledged in his deposition that TJ&A had recommended that Trifinery investigate the site of the above spill. (Doc. 61-4, Martinez Dep., p. 4).

On November 4, 1993, Peggy Felder had a "telephone conference with S. Brass regarding results of ADEM meeting…" and had an "attorney conference regarding no environmental review by T J and Associates." (Doc. 61-9). On November 5, 1993, Ms. Felder had a "telephone conference with B. Wood [of TJ&A] regarding no further environmental review." (Id.). Mr. Wood acknowledged in his deposition that Ms. Wood had notified TJ&A on that date to omit task one of its investigation. (Doc. 61-6, Wood Dep., p. 3). Mr. Wood later testified that after the site visit, TJ&A expanded their recommendations because "[c]onditions we found on the site from our review that additional work, beyond what was said in the correspondence before we went to the facility" and that he notified Trifinery representatives of these expanded recommendations but that none of the additional work was done because task one was omitted by Ms. Wood. (Id., pp. 7-8).

Chevron and Trifinery closed on the purchase of the property on December 30, 1993. (Doc. 61-2). Just one day after the closing, Trifinery transferred the Facility to Alabama Bulk Terminal Company, Inc. ("Alabama Bulk"). (Doc. 61-11). On March 1, 1994, Alabama Bulk transferred the Facility to GCAC Management Company, Inc. ("GCAC Management"). (Doc. 61-12). On June 1, 1994, GCAC Management transferred the Facility to GCAC, who is the plaintiff in this case. (Doc. 61-13). On January 20, 2003, GCAC transferred Parcel B to GC

Realty Investments, L.L.C. ("GC Realty"). (Doc. 61-14). On May 7, 2009, GC Realty transferred Parcel B to GCAC. (Doc. 70-1, p. 24).

GC Realty was formed on November 1, 2002, by Sanford Brass, who is both the owner and operator of GCAC and Trifinery,[1] "[t]o remove the problem created by Chevron of burying material which was discovered in August of 2002 from the collateral we were supplying to [Wachovia Bank]." Mr. Brass explained that Wachovia Bank "did not want to be involved in the scandalous deeds involved in the property as perpetrated by Chevron. And they asked me how best they could get segregated and we investigated and decided we would make it a separate realty company wholly-owned by GCAC [and Joyce Brass]." Basically, GC Realty was formed "to take Parcel B away." (Doc. 61-15, Brass Dep., pp. 4-5). In other words, "[i]t was done because our bank required it at the time and still do until such time as the place is clean, won't allow us to bring it back into the company…" (Id., p. 12).

On April 6, 2009, GCAC brought the present lawsuit against Chevron. (Doc. 1). In its complaint, the plaintiff alleges that although Chevron "represented that there had been a spill of approximately 1,000,000 gallons of asphalt residuum on Parcel B in October 1976", that Chevron told Trifinery that "the spilled material had been removed and disposed of in accordance with regulations of the Alabama Department of Environmental Management." (Id., ¶ 12). The plaintiff asserts that Trifinery "accepted the report and had no reason to doubt that the material spilled in October 1976 spill had been removed and the site cleaned up." (Id., ¶ 13). However, a "[s]ubsequent investigation has revealed that the spilled material was a crude oil mixture known as Pascagoula resid used to manufacture asphalt" and that "[i]t has been in the ground long enough to have become weathered black oily viscous petroleum contamination."

---

[1] (Doc. 1, ¶ 10).

(Id., ¶ 12). The plaintiff alleges that "the October 1976 spill and clean up was misrepresented by Chevron in the 1993 report" in that "approximately 125,000 barrels of crude oil mixture, Pascagoula resid" spilled and "was not cleaned up as represented." (Id., ¶ 17). Thus, the plaintiff has made "numerous entreaties and requests" but Chevron "has refused to clean up and remediate the more than one-million gallons of petroleum contamination that remain on Parcel B to this day." (Id., ¶ 20).

In RCRA Count 1, GCAC brought a suit against Chevron under the citizen suit provisions of RCRA, 42 U.S.C. § 6972(a)(1)(B) because

> Chevron [] is a past generator, past transporter, and past owner and operator of a treatment, storage, or disposal facility, to wit: the Blakely Island Facility, that has contributed to the past or present handling, storage, treatment, transportation, or disposal of solid waste, to wit: crude oil petroleum contamination on Parcel B, which may present an imminent and substantial endangerment to health or the environment.
>
> (Id., ¶ 25).

The plaintiff asks this court to issue an order and injunction against Chevron "compelling it to excavate, remove, and remediate the asphaltic contamination on Parcel B and to comply with all applicable laws and regulations, including the ban against open dumping and the requirement for the proper regulatory closure of the Parcel B area." (Id., ¶ 27).

## LEGAL ANALYSIS

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a

8

genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir. 1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material

9

issue of fact that precludes summary judgment." See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rely merely on allegations or denials in [the non-moving party's] pleading; rather, its response .... must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e). "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation and citation omitted).

## II. Standing

Chevron first asks this court to grant its motion for summary judgment because "GCAC does not have standing" to bring the present suit. (Doc. 62, p. 18). The Constitution of the Untied States limits the subject matter jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. Art. III, § 2. "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Standing "is the threshold question in every federal case, determining the power of the court to entertain the suit." Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). "In the absence of standing, a court is not free to opine in an advisory capacity about the merits of a plaintiff's claims," Bochese v. Town of Ponce Inlet, 405 F.3d 964, 974 (11th Cir. 2005), and

"the court is powerless to continue." Univ of S. Ala. v. Am. Tobacco Co., 168 F.3d 405, 410 (11th Cir. 1999).

GCAC's remaining claim against Chevron is under a "citizen suit" provision RCRA, 42 U.S.C. § 6972(a)(1)(B). That provision provides that

> any person may commence a civil action on his own behalf… against any person… including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment…

The citizen suit provisions of the RCRA does not, in and of itself, satisfy the case-in-controversy requirement of Article III, § 2. Lujan, 504 U.S. at 571-572, 112 S.Ct. 2130. Rather, "the irreducible constitutional minimum of standing contains three elements." Lujan, 504 U.S. at 560, 112 S.Ct. at 2136. A plaintiff who invokes the jurisdiction of a federal court bears the burden to show "(1) an injury in fact, meaning an injury that is concrete and particularized, and actual or imminent, (2) a causal connection between the injury and the causal conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." Granite State Outdoor Adver., Inc. v. City of Clearwater, 351 F.3d 1112, 1116 (11th Cir. 2003). Each element is "an indispensable part of the plaintiff's case" and "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Lujan, 504 U.S. at 561, 112 S.Ct. at 2136. In the context of a motion for summary judgment, "the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' Fed.R.Civ.P[] 56(e), which for purposes of the summary judgment motion will be taken to be true." Id., 112 S.Ct. at 2137.

In the present case, this court needs look no further than the first element – the existence of an injury in fact – to see that GCAC does not have standing to pursue his RCRA claim against Chevron. As stated above, an injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560(internal citations omitted). The Supreme Court stated that "[b]y particularized, we mean that the injury must affect the plaintiff in a personal and individual way." Id. at 561 n. 1. In regards to imminence, the Court stated that "[s]uch 'some day' intentions – without any description of concrete plans, or indeed even any specification of when the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require." Id. at 564.

It is undisputed that at the time GCAC filed its complaint, GC Realty owned Parcel B and not GCAC. (See Doc. 61-14). Rather than disputing this fact, GCAC argues that it has standing, in part, because it received Parcel B from GC Realty after it filed the complaint and because it "controlled Parcel B through its ownership of G.C. Realty." (Doc. 69, p. 7). Neither of these facts, however, confers standing. GCAC can not rely upon the fact that it received title of Parcel B after it filed its complaint because standing goes to the jurisdiction of a federal court to hear a particular case thus it must exist at the commencement of the suit. Focus on the Family v. Pinellas Suncoast Transit Authority, 344 F.3d 1263, 1275 (11th Cir. 2003); see also Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc., 528 U.S. 167, 180, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000)("[W]e have an obligation to assure ourselves that FOE had Article III standing at the outset of the litigation."). It is not enough for GCAC to attempt to satisfy the requirements of standing as the case progresses. The requirements of standing must be satisfied from the outset, and, in this case, they were not. See Perry v. Village of Arlington Heights, 186

F.3d 826, 830 (7th Cir. 1999)(finding that the plaintiff did not establish the "injury in fact" element to pursue constitutional challenges against the seizure and disposal sections of the Illinois Motor Vehicle Code even though he bought an automobile once the suit was commenced, because the plaintiff did not own an automobile at the time he filed his complaint.).

Furthermore, GCAC can not rely on its membership of GC Realty to establish standing. Although GCAC is a member of GC Realty,[2] a member of a limited liability company under Alabama law does not have any interest in specific limited liability company property. See Ala. Code § 10-12-23(a) ("Any estate in real property may be acquired in the name of the limited liability company and title to any estate so acquired shall vest in the limited liability company itself rather than in the members individually."); Ala. Code § 10-12-23(b)("All property originally contributed to the limited liability company or subsequently acquired by a limited liability company by purchase or otherwise is limited liability company property. A member has no interest in specific limited liability company property."); Carey v. Howard, 950 So.2d 1131, 1135-1136 (Ala. 2006)(found members of a limited liability company lacked standing in seeking a declaratory judgment regarding sale of property owned by the limited liability company).

GCAC also argues that the environmental contamination has hindered its ability to build a refinery on Parcel B thus adversely impacting an economic activity, an encumbrance which it maintains is sufficient proof of an injury in fact. (See Doc. 69, pp. 8-9 & 11-12). In fact,

---

[2] Chevron provided this court with a document purporting to be the government record from the Alabama Secretary of State of GC Realty, but this document was actually the government record of the plaintiff, GCAC. (See Doc. 61-19). However, there does not appear to be a dispute that GCAC is a member of GC Realty (see Doc. 62, p. 23 n. 44 & Doc. 69, p. 7), and this court researched GC Realty, Corporation Number 685-787, and found that GCAC and Joyce Brass are listed as members of GCAC Realty.

(See http://arc-sos.state.al.us/cgi/corpdetail.mbr/detail?corp=685787&page=name&file=

GCAC provided several documents which it maintains are "concrete evidence" to support this proposition. (Doc. 69, p. 9). However, none of these documents show that GCAC planned to build a refinery at the time it filed its complaint in 2009 or that it had planned to build a refinery on Parcel B specifically. The first document, which is select portions of a feasibility study for building "vacuum distillation facilities which will process Boscan crude for the purpose of producing paving asphalt", shows that GCAC planned on building a refinery at the Facility around 1997, more than 12 years before it filed the present complaint, and did not specify that this refinery would be built specifically on Parcel B. (See Doc. 70-1, pp. 5-8). The second and third group of documents, which are excerpts from Board of Directors' meeting and a proposal for a refinery respectively, also show that GCAC wished to build a refinery at the Facility approximately a dozen years before it filed its complaint and like the feasibility study, the location of the refinery was not specified. (See Id., pp. 10-11, 14-15, 18-19). The last document is a proposed agreement for GCAC to supply Owens Corning with approximately two-million barrels of asphalt products per year. (See Id., pp. 21-22). This document, like the documents above, does not mention Parcel B at all. Furthermore, it was sent to Sanford Brass on February 9, 2005, which is particularly important because it is approximately three years after GCAC retained a geotechnical firm to conduct a survey of Parcel B, where it discovered "liquefied viscous oil deposits under the tank pads." (Doc. 1, p. 3, ¶¶ 14 & 15). Thus, it would be disingenuous of GCAC to assert that this document proves that it had an intent to build a refinery on Parcel B in 2005 when it found out three years earlier that that parcel had an environmental contamination which allegedly prevents it from building a refinery.

     As a result, the only evidence provided by GCAC that directly supports its argument is an affidavit by Mr. Brass. (See Doc. Doc. 70-1, Brass Aff., pp. 2-3). Mr. Brass states that he has

"been unable to build the refinery because of the extensive contamination on Parcel B" and that "[a]s soon as Parcel B is cleaned up, I intend to immediately begin the process of constructing an asphalt refinery at the Blakely Island facility." (Id.). Besides referencing the above documents, Mr. Brass does not provide any other specific plans, contracts, schedules, or economic analysis that support the above conclusory statement. "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment." Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005)(citing Bald Mountain Park, Ltd. v. Oliver, 863 F.2d 1560, 1563 (11th Cir. 1989). "Moreover, statements in affidavits that are based, in part, upon information and belief, cannot raise genuine issues of fact, and thus also cannot defeat a motion for summary judgment." Id.(citing Pace v. Capobianco, 283 F.3d 1275, 1278-1279 (11th Cir. 2002); Fed.R.Civ.P. 56(e)).

In light of the foregoing, this court finds that the plaintiff has failed to establish it has suffered from an injury in fact. Without an injury in fact with respect to Count I, the plaintiff has failed to show that it has standing to pursue a RCRA claim against Chevron. Accordingly, Chevron's motion for summary judgment is due to be granted and Count I is due to be dismissed.[3]

---

[3] GCAC asks this court to find that the environmental contamination on Parcel B is a "threat of imminent and substantial harm to health or the environment." (See Doc. 69, pp. 14-19). In order to prevail under § 6972(a)(1)(B), a plaintiff must show conditions "which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). This court, however, is not allowed to make a rule on the merits of GCAC's claim because this court found that GCAC lacks standing to bring this suit. The Court of Appeals for the Eleventh Circuit maintains that "'[i]n the absence of standing, a court is not free to opine in an advisory capacity about the merits of a plaintiff's claims,'" and "'the court is powerless to continue.'" CAMP Legal Defense Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1269 (11th Cir. 2006)(internal citations omitted); see also Maverick Media Group, Inc. v. Hillsborough County, Fla., 528 F.3d 817, 819 (11th Cir. 2008).

### III. Contractual Release of Liability

Even if this court were to find that GCAC has adequate standing to pursue Count I, this court finds that GCAC, as a successor in interest of Trifinery, contractually released Chevron from liability as to Count I. The PSA is governed by Alabama law. (Doc. 61-2, p. 14, ¶ 23). Under Alabama law, "a contract… should be construed as written", thus "[i]f the court determines that the terms are unambiguous (susceptible of only one reasonable meaning), then the court will presume that the parties intended what they stated and will enforce the contract as written." Shoney's LLC v. MAC East, LLC, 27 So.3d 1216, 1222-1223 (Ala. 2009)(citations omitted). The "[t]erms of a written instrument should be construed in pari materia and a construction adopted that gives effect to all terms used." Moreover, "[i]nconsistent parts in a contract are to be reconciled, if susceptible of reconciliation; however, if that is not possible, any doubt will be resolved in favor of the first part, considering the instrument as a whole." Sullivan, Long, & Hagerty v. Southern Elec. Generating Co., 667 So.2d 722, 725 (Ala. 1995)(citations omitted).

A contract including a release of liability is valid under Alabama law. "[A]bsent fraud, a release, supported by valuable consideration and unambiguous in meaning, will be given effect according to the intention of the parties from what appears in the four corners of the document itself; and parol evidence is not admissible to impeach or vary its terms." Wayne J. Griffin Elec., Inc. v. Dunn Construction Co., 622 So.2d 314, 317 (Ala. 1993)(citations omitted). Construing the release and the PSA in its entirety, this court finds no ambiguity and the plaintiff has presented no evidence that it was fraudulently induced into executing the release provisions. Therefore, this court must look to what appears on the face of the PSA – to the clear and plain

words of the releases – in order to give the releases effect according to the intentions of the parties.

As stated above, the PSA provided in plain words that GCAC, as a successor in interest, "shall release, indemnify and hold [Chevron] harmless from and against all claims, expenses…, loss and liability arising from any environmental contamination present on or under the Property or origination from operations at the Property or otherwise on account of the condition of the Property" with an exception "to environmental contamination on the Property for which [Chevron] has agreed to indemnify [GCAC] pursuant to section 5d" of the PSA. (Doc. 61-2, p. 7, ¶ 5e). Subsection 5d of the PSA provides that Chevron "shall indemnify, and hold Buyer harmless from and against all claims, expenses…, loss or liability arising from" two circumstances: (1) "any claims by third parties to the extent based on Covered Contamination" or (2) "any cleanup costs and related expenses incurred as a result of any cleanup of Covered Contamination which may be ordered or effectuated subsequent to the date of the Closing by federal, state or local governmental authorities." (Id., ¶ 5.e.). In its complaint, GCAC asks this court to issue an order and an injunction against Chevron "compelling it to excavate, remove, and remediate the asphaltic contamination on Parcel B and to comply with all applicable laws and regulations, including the ban against open dumping and the requirement for the proper regulatory closure of the Parcel B area." (Id., ¶ 27). Since this claim is (1) not a claim by a third party because GCAC has succeeded to all of the rights and obligations for Trifinery and sues as an assignee of Trifinery; and since (2) it is not a claim for "cleanup costs and related expenses" because the plaintiff's remaining claim under RCRA authorizes only injunctive relief, this court finds that Chevron has been released from liability as to the plaintiff's claim for an injunction.

Despite the unambiguous release provisions of the PSA, GCAC argues that subsection 5.b. requires Chevron to clean up Parcel B since that subsection provides that Chevron "shall correct or make arrangements for the correction of such Covered Contamination, to the reasonable satisfaction of [GCAC]." (Doc. 69, p. 23, ¶ 21). However, this requirement becomes effective only if two contingencies are met: (1) Trifinery/GCAC "elect[s] to terminate this Agreement" and (2) the "environmental review has determined that Covered Contamination is present." (Doc. 61-2, p. 6, ¶ 5.b.). The plaintiff's complaint provides that the "liquefied viscous oil deposits under the tank pads" was discovered in September 2002 and not during the pre-closing "environmental review."[4] GCAC has provided no evidence that any "Covered Contamination" was "determined" by "environmental review" to be present on Parcel B or that Trifinery notified Chevron of any problems prior to closing. As a result, this court finds that subsection 5.b. is unambiguous and does not require Chevron to clean up the alleged environmental hazard on Parcel B.

In sum, GCAC, as a successor in interest of Trifinery, contractually released Chevron from liability as to Count I. Therefore, even if this court were to find that GCAC has shown it has standing to pursue the RCRA claim, this court finds that Chevron's motion for summary judgment would still be due to be granted.

### IV. Indemnification

Chevron has also asked this court to grant summary judgment on its third party claim against Trifinery for indemnification. (Doc. 62, p. 33). As stated above, Chevron filed a third

---

[4] As stated above, the PSA provided a two-month pre-closing "environmental review" in which Trifinery had the right "to terminate [the PSA] by giving written termination notice to [Chevron] if [Trifinery] in its sole discretion determines that the Property is not satisfactory for Buyer's intended use of it or for any other reason in [Trifinery's] sole and absolute discretion." (Id., p. 9, ¶ 6.b).

18

party complaint against Trifinery arising "from the contractual obligation of Trifinery to indemnify Chevron from and against claims made by" GCAC. (Doc. 53, p. 1). Trifinery agreed in the PSA to indemnify Chevron for all claims and costs relating to environmental contamination at Parcel B, including attorney's fees and costs, with two exceptions which, as stated above, are inapplicable (See Doc. 61-2, p. 7, ¶¶ 5e & 5d). Furthermore, although Trifinery assigned the property to another company shortly after the closing date, the PSA provides that Trifinery and Chevron "shall [not] assign any rights or delegate any duties hereunder without the prior written consent of the other". (Id., ¶ 11). There is no evidence Chevron agreed to relieve Trifinery from its duty under the PSA to indemnify Chevron. Therefore, this court finds that Trifinery is contractually obligated to indemnify Chevron from and against GCAC's claim in this case and to reimburse Chevron for the costs its has incurred in defending itself in this lawsuit.

## CONCLUSION

After due consideration of all matters presented and for the reasons set forth herein, it is **ORDERED** that Chevron's motion for summary judgment (Doc. 61) is **GRANTED**.

**DONE and ORDERED** this 30th day of August, 2010.

/s/ Callie V. S. Granade
UNITED STATES DISTRICT JUDGE